**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UNITED STATES OF AMERICA,    ) | |
| ) | |
| Plaintiff,    ) | |
| vs.    ) | NO.  CR-08-0004-HE |
| ) | |
| MCSHA PROPERTIES INC.,    ) | |
| ) | |
| Defendant.    ) | |

**ORDER**

Defendant McSha Properties, Inc. ("McSha") has moved for reconsideration of the court's January 29, 2008, decision to reject the plea agreement in this case.  The government has responded to the motion.

Background

McSha previously petitioned the court to enter a guilty plea to a two count information charging violations of 18 U.S.C. §1343 (wire fraud) and 18 U.S.C. §1957(a) (money laundering).  Violation of 18 U.S.C. §2 (aiding and abetting) is also alleged in the information as to each count.  The information includes forfeiture allegations pursuant to which the defendant would forfeit $5,971,565, the sum alleged to represent the proceeds of the scheme alleged in the wire fraud count.  Defendant's guilty plea was pursuant to a plea agreement with the government.

The allegations of the information, together with the various submissions of the parties and the facts proffered at the plea hearing, suggest the following.  McSha is a privately held Oklahoma corporation engaged in, among other things, the development of low income housing projects using the federal tax credit program set out in Section 42 of the Internal

Revenue Code. Certain principals of McSha engaged in a scheme pursuant to which they created multiple limited liability companies in Texas and Oklahoma. At least some of these companies served no legitimate business purpose, but were used by the involved McSha principals to create and submit fictitious invoices for construction work on projects under the general control of McSha. The invoices were fictitious in that no work was actually performed by the shell companies.[1] The fictitious invoices were apparently used by McSha to artificially inflate the construction costs claimed to have been incurred in connection with its various projects, thus increasing the eligible basis for the Section 42 housing tax credits issued in connection with the projects. The bulk of the funds diverted through the shell corporations from payment of the fictitious invoices, totaling approximately $5,971,565, ended up in the hands of the McSha principals. The economic consequences to the government from the issuance of inflated tax credits is indicated to be less than the just-stated figure. Due to the manner in which Section 42 tax credits are calculated, there is not a one-to-one relationship between the wrongful diversions and the amount of the tax credits.[2]

The specific wire fraud scheme alleged in the information involves inflation of the eligible basis for tax credits issued in connection with a McSha project in Choctaw,

---

[1] For example, WFT General Contractors, LLC, referenced in the information, had no employees and performed no construction work at all.

[2] The parties indicate the principals paid personal income tax on the amounts wrongfully diverted to each of them through the shell corporations, which also affects the total financial impact of the scheme on the government.

Oklahoma.[3] According to the information, a fictitious invoice in the amount of $425,067.91 was generated by WFT General Contractors, LLC ("WFT"), the shell entity. This became part of the basis for a request for disbursement of loan proceeds directed to JPMorgan Chase Bank, N.A., which triggered the bank's interstate wire of the loan proceeds. The payment of the WFT invoice from the disbursed funds is the basis for the money laundering count.

As noted above, McSha's tendered guilty plea is pursuant to a plea agreement. The plea agreement provides for McSha's guilty plea to the indicated counts plus forfeiture of $5,971,565 to the government, to be incorporated into a money judgment at sentencing. The agreement provides for payment of $1,000,000 immediately, with additional payments totaling $3,120,380 over the next eighteen months.[4] If defendant makes these payments as indicated, totaling $4,620,380, in that period, the government agrees to forego the difference between $5,971,565 and $4,620,380. The principals of McSha – Lewis Patrick Colbert, Steven Clifford Jones, Michael H. McClure, Larry C. Shaver, and Howard Michael Wampler[5] – guarantee payment of these amounts by written guaranties attached to the plea agreement.

The plea agreement also contains the parties' agreement that the loss for purposes of

---

[3] Each McSha project was apparently set up as a separate entity, with McSha acting as general partner or manager. The Choctaw, Oklahoma, project involved McSha Affordable Housing - Choctaw, LP.

[4] The agreement also provides for the payment of $500,000 within eighteen months of the entry of the plea toward any fine imposed by the court.

[5] It is unclear whether these persons are all the principals of McSha or whether they are just the ones alleged to be involved, in some fashion, in the circumstances pertinent here.

U.S.S.G. §2B1.1(b)(1) is between $2.5 million and $7.0 million.

Most important for present purposes, the plea agreement contains a provision that the principals of McSha referenced above will not be prosecuted for any involvement in the scheme(s) which they may have had.[6] It also provides for certain limitations on further activities by McSha or its principals on Section 42 projects.

On January 29, 2008, a plea hearing was conducted. After consideration of the submissions and arguments of the parties, the court concluded the plea agreement — particularly its guarantee of the absence of criminal prosecution of the principals of McSha — was not in the interests of justice and rejected the plea agreement.[7] Defendant's present motion seeks reconsideration of that conclusion.

## Discussion

Defendant suggests the decision to charge particular individuals with a crime is purely an executive branch function and that the court has no proper role to play. It further suggests that, if the court concludes it properly has some role, it should defer to the government's decision unless it is "clearly contrary to manifest public interest," and that, for various

---

[6]The non-prosecution agreement also extends to eleven LLC's or limited partnerships through which particular Section 42 projects in Oklahoma were structured.

[7]As the government correctly notes, the court's disposition of the matter, i.e., whether the court's rejection was directed only to the plea agreement or to both the agreement and the plea itself, was not clear. The court's assumption at the time was that if the plea agreement was not accepted by the court, the defendant would not pursue the plea which had not, at that point, been accepted by the court. That conclusion may have been premature and the issue is addressed later in this order.

reasons, the plea agreement in this case should past muster under the applicable standard. Finally, McSha argues that the government should be held to the plea agreement because it (McSha) has detrimentally relied on the plea agreement and has suffered various consequences as a result of its tendered plea. In its response, the government concedes the court's power to reject a plea agreement under Rule 11 and rejects defendant's effort to enforce the plea agreement, notwithstanding the court's rejection of it, on the basis of detrimental reliance. However, the government generally concurs with defendant's discussion of various considerations impacting the merits of the plea agreement.

As a threshold matter, it is well to remember what the court did and did not do by its rejection of the plea agreement. The court did not direct, or presume to direct, the U. S. Attorney to charge, or seek the indictment of, any particular person. Had it done so, defendant's separation of powers arguments might have some force, but that is not the circumstance existing here.[8] Rather, what the court did was reject a plea agreement the provisions of which bound the government to <u>not</u> charge identified individuals. That is a horse of a somewhat different color.

The law is well established that there is no absolute right to have a guilty plea accepted, and a court may reject the plea in the exercise of sound judicial discretion. <u>Santobello v. New York</u>, 404 U.S. 257 (1971). Fed.R.Crim.P. 11(c)(3)(A) states that a court

---

[8]Defendant's rather remarkable suggestion that the court should now "indicate how many individuals need to be charged" (Defendant's brief, p. 22), is inconsistent with the court's proper role and is, of course, rejected.

may reject a plea agreement of the type referenced in Rule 11(c)(1)(A). The latter section references plea agreements where the government agrees it will "not bring, or will move to dismiss, other charges." The plea agreement in this case plainly involves such an agreement. Rule 11 "contemplates the rejection of a negotiated plea when the district court believes that the bargain is too lenient, or otherwise not in the public interest." United States v. Carrigan, 778 F.2d 1454, 1462 (10th Cir. 1985) (quoting United States v. Miller, 772 F.2d 562, 563 (9th Cir. 1983)).

Carrigan also makes clear the standard applicable to the court's decision here. It is not the "clearly contrary to the manifest public interest" test suggested by defendant, a standard grounded in Fed.R.Crim.P. 48 and the dismissal of pending charges, but rather is the Rule 11 standard applicable to comprehensive plea agreements.[9] In applying the Rule 11 standard, a court "may reject a plea in exercise of sound judicial discretion." Santobello, 404 U.S. at 262; United States v. Robertson, 45 F.3d 1423, 1437 (10th Cir. 1995).

The court is unpersuaded that its initial assessment of the merits of the plea agreement was wrong. It is, of course, fundamental that a corporation does not have knowledge or criminal intent separate from that of the persons who run it or who act for it as its agents.

---

[9]Carrigan involved factual circumstances remarkably close to those involved here — a plea agreement contemplating dismissal of all charges against the individual defendant and a guilty plea by the corporation. There, however, both defendants had been charged initially and dismissal as to the individual was sought to implement the plea agreement. Even in that circumstance (i.e. dismissing a currently charged defendant), the Court of Appeals nonetheless concluded the less stringent Rule 11 standard was applicable to the district court's decision to reject the plea.

6

Here, the number of persons potentially responsible for the wrongful acts is small.[10] The scope of the illegal activities executed by the corporation — at someone's behest — was large. The charged scheme apparently involved multiple shell corporations in both Texas and Oklahoma and multiple projects in which McSha was involved. The charged scheme apparently involved substantial losses to the government even if, as appears to have been the government's focus up to this point, loss is analyzed in terms of tax cost. If the measure of the criminal activity is tied to the total wrongful diversions through the shell corporations, the amount is greater ($5,971,565).

It may well be, as defendant suggests, that proof of the criminal culpability of any particular individual would be difficult. However, under the circumstances present here, the court is unpersuaded that the litigation risks are so substantial as to warrant giving McSha's principals complete insulation from criminal exposure.[11]

Defendant's suggestion that the plea agreement is in the interests of justice because the government recovers an amount of money "substantially larger than the harm caused by [defendant's] conduct" raises as many questions as it answers. If that is in fact the case, why

---

[10] The court obviously has no way of knowing whether all five of the persons protected from criminal prosecution by the proposed plea agreement were culpable. What appears reasonably clear is that the responsible person or persons are among the five.

[11] The government suggests it can prove the various companies were shells and that no services were provided by most or all of them. With respect to the culpability of particular individuals, government counsel stated "obviously its different for each individual as to what you can prove as to their knowledge and intent, but there are cases that could be made here. I don't deny that." (Plea hearing transcript, p. 35).

are the protected individuals so willing to step up and obligate themselves on substantial guaranties in excess of the amount of harm to the government? Perhaps, particularly as to the individuals who retain a role with McSha or its related companies,[12] there are financial incentives to do so. No doubt there are concerns with maintaining the ongoing financial viability of McSha and its related companies. However, it seems apparent that at least part of the reason for the willingness of some or all of the individuals to guarantee payment of the substantial forfeiture amount is to avoid personal criminal exposure.

The court rejects defendant's suggestion that its reliance on, or the collateral consequences flowing from, the plea agreement or plea negotiations should require the agreement's enforcement. The issue here is not whether the government should be held to its agreement; the government is perfectly willing to go forward with the agreement it struck. What is at issue is the court's role in approval of plea agreements. If defendant's argument is accepted, the court would be effectively cut out of the plea approval process, based solely on actions or conduct of others. Such a result is plainly contrary to the terms and import of Rule 11.

It is unnecessary to analyze in detail the other justifications offered for this particular plea agreement.[13] Suffice it to say they do not persuade the court to reverse its previous

---

[12] The record suggests two, or perhaps three, of the individuals referenced in the plea agreement are no longer employed by, or officers of, McSha.

[13] One merits some mention. The court is unpersuaded that significant weight should be given to the "remediation" provisions of the agreement. The plea agreement does not completely preclude future work on Section 42 projects by either McSha or its principals, but

determination.[14]

Defendant's motion to reconsider [Doc. #9] is **DENIED**.  As the court's rejection of the plea agreement does not necessarily require rejection of defendant's plea, defendant is directed to advise the court within ten days of entry of this order as to whether defendant wishes to proceed with its plea or withdraw it.

**IT IS SO ORDERED**.

Dated this 6th day of March, 2008.

_____
JOE HEATON
UNITED STATES DISTRICT JUDGE

---

permits them to act through sub-contractors on Section 42 projects so long as McSha or its principals do not actually sign the documents directed to syndicators or the government. Plea Agreement, para. 11.  In the present context, involving persons and entities with a history of using shell entities to accomplish their purposes, the protection afforded by this provision appears somewhat ephemeral.

[14]The court recently forwarded to counsel copies of communications from third parties to the court relating to this case.  The court has not considered the content of those communications in reaching its decision here.